JOHN R. GARNER, Esq. (SBN 246729)
PETER C.L. CHEN, Esq. (SBN 246720)
CAITLIN J. HOFFMAN, Esq. (SBN 329192)
**GARNER & ASSOCIATES LLP**
520 Capitol Mall, Ste. 280
Sacramento, CA 95814
Telephone: (530) 934-3324
john@garner-associates.com
peter@garner-associates.com
caitlin@garner-associates.com

Attorneys for Plaintiff
Scott Duthie

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT DUTHIE, an individual residing in Montana, <br><br> Plaintiff, <br><br> v. <br><br> RIN, INC. a California corporation; JEFF MILLER, an individual in California; ALEXANDER "SASHA" JENSON, an individual in California; WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; and Does 1-10 <br><br> Defendants. | CASE NO.: <br><br> **COMPLAINT FOR:** <br><br> **(1) DECLARATORY AND INJUNCTIVE RELIEF** <br> **(2) FRAUDULENT CONCEALMENT; AND** <br> **(3) TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Scott Duthie ("Plaintiff" or "Duthie"), on information and belief, alleges as follows:

1. This litigation concerns the valuable intellectual property rights to "Rin Tin Tin," a famous German Shepherd canine character that starred in dozens of acclaimed, international movies, television shows, and books. Collectively, Rin Tin Tin and Rin Tin Tin related productions have spawned millions and millions of dollars in profits—even helping to save a then-fledgling Warner Bros. back in the 1920s and 1930s.

2. Nine years ago, in 2011, Plaintiff—a motion picture and television producer in Montana—was assigned 50% of all world-wide intellectual property rights in Rin Tin Tin. Given the obvious value in that ownership, Plaintiff has been interested in leveraging those property rights to produce movies and shows, including bringing Rin Tin Tin back to life on the big screen.

3. To his surprise, Plaintiff learned in late 2019 that Defendants were developing and producing a new movie starring Rin Tin Tin. Plaintiff was understandably concerned about being compensated for his 50% interest in the intellectual property and, more importantly, questioned whether Defendants even recognized his ownership stake. Defendants issued a press release at the time that seemed to suggest Defendants possessed the entirety of the intellectual property in Rin Tin Tin—a factual inaccuracy with enormous consequences to Plaintiff.

4. Plaintiff reached out to Defendants soon after the press release, inquiring about the project. Despite months of emails and phone calls, Defendants have refused to acknowledge the validity of Plaintiff's 50% ownership. Plaintiff therefore brings this Complaint for declaratory and injunctive relief, including money damages.

## PARTIES

5. Plaintiff Duthie is an individual residing within the State of Montana.

6. Plaintiff owns fifty (50) percent of the copyright interest in the character of Rin Tin Tin.

///

7. Upon information and belief, Defendant Rin, Inc. ("Rin Inc.") is a corporation formed under the laws of the State of California with its principal place of business at 6374 Arizona Circle, Los Angeles, California 90045.

8. Upon information and belief, Defendant Jeff Miller ("Miller") is an individual residing in the State of California and is a director and the chief executive officer of Defendant Rin, Inc.

9. Upon information and belief, Defendant Alexander "Sasha" Jenson ("Jenson") is an individual residing in the State of California and is a director of Defendant Rin, Inc. He is also Rin, Inc.'s secretary and chief financial officer.

10. Upon information and belief, Defendant Warner Bros. Entertainment Inc. ("Warner Bros.") is a corporation formed under the laws of the State of Delaware with offices at 4000 Warner Blvd., Burbank, California 91522.

11. The true names and capacities of Defendants DOES 1 through 10, inclusive, are unknown, but Plaintiff alleges that these Defendants are responsible in some manner for the acts, omissions, events or transactions alleged in this Complaint, and Plaintiff therefore sues them by such fictitious names. Plaintiff will amend this Complaint to state the true names and capacities of said Defendants when such names are ascertained.

12. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, Defendants and each of the Defendants fictitiously named, in addition to acting for himself, herself or itself, and on his, her or its own behalf individually, is and was acting as the agent, servant, employee and representative of, and with the knowledge, consent and permission of, and in conspiracy with each and all of the other Defendants and within the course, scope and authority of that agency, service, employment, representation and conspiracy. Plaintiff further alleges on information and belief that the acts of each of the Defendants was fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the actions, failures to act, breaches, conspiracy and misrepresentations alleged herein and attributed to one or more of the specific Defendants were approved, ratified

and done with the cooperation and knowledge of each and all of the Defendants.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) because Plaintiff's requested relief arises under the Copyright Act.

14. Plaintiff's requests for relief arise out of Defendants' activities purposefully aimed at this judicial district, and Defendants' acts and the resulting consequences have a substantial connection to this judicial district such that the exercise of jurisdiction is reasonable. The exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

15. This Court has personal jurisdiction over Defendants in that they transact business in California and within this judicial district.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's requests for relief occurred within this judicial district. Venue is also proper in this district under 28 U.S.C. § 1400(a) because Plaintiff's requests for relief arise out of the Copyright Act and, upon information and belief, each and every Defendant or their agent "resides or may be found" within this judicial district.

## RELEVANT HISTORY OF RIN TIN TIN

### A. Development of the Rin Tin Tin Character

17. Rin Tin Tin is a beloved American character based on a German Shepherd puppy discovered by Lieutenant Lee Duncan ("Duncan") on a World War I battlefield in Flirey, France in 1918.

18. The character Rin Tin Tin became famous in the United States primarily because the character starred in twenty-three feature films between 1922 and 1931 that have been credited with saving a then-fledgling Warner Bros., which was founded by four brothers from Youngstown, Ohio in 1918.[1]

---

[1] Susan Orlean, *The Dog Star: Rin Tin Tin and the making of Warner Bros.*, The New Yorker, Aug. 22, 2011 (available at: https://www.newyorker.com/magazine/2011/08/29/the-dog-star) (last visited Aug. 5, 2020).

19. Shortly after the Rin Tin Tin character's success at Warner Bros., the character became a hit with television audiences after the production of 164 black and white episodes of *The Adventures of Rin-Tin-Tin*, which ran from October 1954 through May 1959 produced by Herbert Leonard ("Leonard") with Duncan's permission.

20. The original films and numerous appearances on radio dramas (in the years before televisions became commonplace) sufficiently delineated the Rin Tin Tin character to merit copyright protection for the character.

21. In 1960, Rin Tin Tin was honored with a star on the Hollywood Walk of Fame.

22. Duncan and Leonard's production company later entered into a March 24, 1955 letter agreement that assigned broad rights to Duncan's life story and the Rin Tin Tin character to Leonard's production company.

23. The letter agreement expressly allowed Leonard's production company to include "or depict scenes, stories, plots and/or characterizations, either factual or fictional, as [Leonard] may determine and that [Duncan] and Rin Tin Tin may be depicted therein in such manner as [Leonard] may determine either under [Duncan's] real name or names or any other name or names selected by [Leonard]."

24. Two subsequent agreements between Duncan and Leonard's production company, on October 3, 1955 and March 1, 1957, each increased the breadth of the rights assigned to Leonard's production company.

25. On August 30, 1962, Leonard's production company assigned the copyright registrations for each episode of *The Adventures of Rin-Tin-Tin* to Leonard personally in a broad grant that included "but [was] not limited to, all of [his production company's] rights, title and interest in and to any copyrights on the literary, music, dramatic and other material upon which the same are based or from which the same are adapted, and all renewals and extensions of said copyrights that may be obtained under the laws now or hereafter in force and effect in the United States of America or elsewhere . . . ."

26. After Duncan passed away, his widow, Eva Duncan ("Eva"), made three broad assignments to Leonard that encompassed any intellectual property rights or related rights to the Rin Tin Tin character that Leonard did not already own.

**B. Leonard's Financial Trouble**

27. In the mid-1990s, Leonard included, as a security interest, in an agreement with a creditor limited rights to revenue derived from a specific work he and a creditor expected to produce featuring the Rin Tin Tin character. This included rights to some of the television episodes that Leonard had produced featuring the character.

28. The agreement recognized that Leonard's creditor would not "possess a security interest in the contemplated 'Rin Tin Tin' motion picture production, the copyright and distribution rights thereto, the underlying literary rights, the characters, sequel, prequel and remake rights thereof, and any and all rights secured by [Leonard] pursuant to the Eva Duncan contract."

29. In a December 15, 2000 agreement between Leonard and the same creditor, Leonard again agreed to let the creditor recover monies owed by Leonard from the revenue generated by specific and limited works featuring the Rin Tin Tin character.

**C. Transfers of Rights to Max Kleven and Plaintiff**

30. In 2002, Leonard was diagnosed with cancer and moved in, rent-free, with his longtime friend, Max Kleven ("Kleven"), who was one of the stuntmen in The Adventures of Rin-Tin-Tin.

31. In 2005, Leonard assigned all of the intellectual property rights that he owned in and to the Rin Tin Tin character to Kleven.

32. On August 3, 2011, Kleven assigned a fifty (50) percent interest in all intellectual property rights, including but not limited to copyright, in the United States and worldwide in the Rin Tin Tin character to Plaintiff. (See Exhibit A.)

**DEFENDANTS' UNLAWFUL ACTIONS**

33. On July 11, 2018, Defendant Miller threatened a lawsuit and contempt proceedings based on public statements made by Kleven that Plaintiff owned fifty (50)

percent of the intellectual property rights in the character Rin Tin Tin.

34. Upon information and belief, Defendant Miller negligently and incorrectly believed that Defendants had obtained from Kleven one hundred (100) percent of the copyright in the Rin Tin Tin character.

35. On February 9, 2015, Kleven filed a complaint ("Kleven's 2015 Complaint") against several parties, including Defendants Rin, Inc., Jenson, and Miller alleging that they had manipulated the elderly Kleven into assigning away a fifty (50) percent interest in the intellectual property rights to the character Rin Tin Tin (the 50% Kleven retained after his 2011 assignment of 50% of the rights to Plaintiff).

36. Plaintiff was never a party to Kleven's lawsuit.

37. According to Kleven's 2015 Complaint, Defendant Jenson recommended Defendant Miller, who was practicing law at the time, to handle various intellectual property related issues for Kleven.

38. As described in Kleven's 2015 Complaint, Jenson, Miller, and a third party working with them misrepresented the terms of an agreement that Kleven signed on February 1, 2013, relying on their misrepresentations (the "2013 Agreement").

39. Upon information and belief, Defendants Jenson, Miller, and Rin, Inc. convinced Kleven to file a lawsuit with them as plaintiffs to cancel eight federally registered trademarks related to Rin Tin Tin that were owned by Belleair Trading International, LLC ("Belleair Trading").

40. Upon information and belief, Miller and one other principal of Rin, Inc. drove to Kleven's home and found Kleven working in the garden. Upon information and belief, Kleven was not wearing his eyeglasses, which he needed to see, or his hearing aids, which he needed to hear. Upon information and belief, Defendant Miller and another principal of Defendant Rin presented Kleven with a document entitled Rin Tin Tin Deal Memorandum Agreement, which they told Kleven he needed to sign as part of their lawsuit against Belleair Trading. Upon information and belief, Kleven signed this agreement without understanding that, upon successful conclusion of the lawsuit against

- 7 -
**COMPLAINT**

Belleair Trading, it would form a new company redistributing the Rin Tin Tin intellectual property.

41. Kleven's 2015 Complaint alleged that Defendants Rin, Inc., Jenson, Miller, and their partners systematically excluded Kleven from participation in the lawsuit against Belleair Trading and meetings concerning the Rin Tin Tin intellectual property where those Defendants entered into agreements that further diluted Kleven's remaining ownership interest.

42. Regardless, even assuming Kleven validly assigned his 50% ownership of the Rin Tin Tin intellectual property to Defendants Rin, Inc., Jenson, and Miller, that purported assignment of rights occurred after Kleven's August 3, 2011 assignment of fifty (50) percent to Plaintiff.

43. Accordingly, Defendants could have only received a maximum of 50% of the intellectual property rights to Rin Tin Tin.

**PLAINTIFF LEARNS OF DEFENDANTS' CURRENT PRODUCTION**

44. On November 11, 2019, an article appearing on deadline.com reported that Warner Bros. had set up a movie built around Rin Tin Tin. [2]

45. Upon information and belief, Defendants fail to recognize Plaintiff's fifty (50) percent interest in the intellectual property rights in the Rin Tin Tin character and entered into an agreement to produce new movies and/or other audiovisual works based upon the Rin Tin Tin character and intellectual property and profited thereby without providing an accounting to Plaintiff.

46. After Plaintiff learned about Warner Bros.'s intention to create a movie starring Rin Tin Tin, Plaintiff, through his counsel, contacted Defendant Warner Bros. to inform it of Plaintiff's ownership rights in the Rin Tin Tin character.

47. Defendant Warner Bros. responded in an April 30, 2020 letter stating that

---

[2] Mike Fleming Jr., *Warner Bros Revives 'Rin Tin Tin' With 'Addams Family' Scribe Matt Lieberman; Hero Hound Once Saved the Studio*, Deadline, Nov. 11, 2019 (available at: https://deadline.com/2019/11/rin-tin-tin-new-movie-warner-bros-matt-lieberman-dog-saved-studio-1202781479/#!) (last visited October 29, 2020).

Plaintiff's dispute was with Defendant Rin, Inc.

48.  To date, no Defendant has made any payment to Plaintiff in accordance with his ownership in Rin Tin Tin. Nor has any Defendant even recognized Plaintiff's valid 50% ownership in the Rin Tin Tin intellectual property.

## COUNT ONE

### (Declaratory and Injunctive Relief, 17 U.S.C. §§ 101 et seq.)

*(Against all Defendants and DOES 1 - 10)*

49.  Plaintiff hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

50.  As a 50 percent owner of the rights in and to the Rin Tin Tin character, Plaintiff is entitled to an accounting of all monies derived from exploitation of that character.

51.  Given the lucrative nature of the intellectual property rights and the various parties' involvement, Plaintiff seeks a judgment declaring the Parties' respective ownership interests and intellectual property rights, as described below, and an order requiring Defendants to provide an accounting as required by the Copyright Act.

## COUNT TWO

### (Fraudulent Concealment)

*(Against Defendants Jenson and Miller and DOES 1 - 10)*

52.  Plaintiff hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

53.  On information and belief, Defendants Jenson and Miller knowingly concealed Plaintiff's ownership interest from third parties in an effort to gain a competitive advantage and in order to profit at Plaintiffs' expense and in a manner that resulted in devaluation of the property at issue in this litigation. Defendants Jenson and Miller excluded Plaintiff from critical business negotiations and opportunities all in an effort to profit at Plaintiff's expense. Defendants negotiated with third parties concerning Plaintiff's rights without Plaintiff's knowledge to advance Defendants'

interests and profit at Plaintiff's expense. Upon information and belief, Defendants Jenson and Miller intentionally kept Plaintiff's rights concealed from third parties that planned to invest a significant amount of time and energy into producing films exploiting Plaintiff's rights.

54. Upon information and belief, third parties negotiating with Defendants Jenson and Miller would not have entered into those negotiations but for the concealment of Plaintiff's rights.

55. Defendants Jenson and Miller owed a duty to disclose Plaintiff's ownership interest to third parties with whom they were negotiating.

56. Defendants Jenson and Miller owed a duty to Plaintiff to disclose Plaintiff's ownership interest in the intellectual property rights at issue.

57. Plaintiff's fifty (50) percent ownership of the rights at issue is a material fact in any negotiation concerning those rights.

58. At all relevant times, Plaintiff was unaware that Defendants were representing to third parties that they owned the whole of the intellectual property rights at issue.

59. As a direct and proximate result of this fraud and concealment, and continuing conspiracy to conceal and defraud, Plaintiff has sustained damages in an amount to be proven at trial.

60. By engaging in their intentional fraud and conspiracy to defraud, Defendants Jenson and Miller intentionally acted with oppression, fraud, malice, in a despicable manner and in conscious disregard for the rights of Plaintiff entitling Plaintiff to an award of exemplary and punitive damages against these Defendants, the exact amount to be proven at trial.

## COUNT THREE

**(Tortious Interference with Existing and Prospective Economic Advantages)**

*(Against Defendants Jenson and Miller and DOES 1 - 10)*

61. Plaintiff hereby incorporates by reference all preceding paragraphs of the

Complaint as if set forth herein at length.

62. Plaintiff had a mutually beneficial economic relationship with Kleven arising out of Plaintiff's intellectual property rights discussed herein.

63. At all relevant times, Plaintiff was developing a movie that would have utilized the Rin Tin Tin Rights.

64. Defendants Jenson and Miller knew of Plaintiff's economic relationship with Kleven and of Plaintiff's evolving economic relationships with third parties based on their development of a movie utilizing Plaintiff's intellectual property rights in and to the Rin Tin Tin character discussed herein.

65. Defendants Jenson and Miller knowingly and intentionally interfered with these relationships. On information and belief, Defendants coerced, pressured, and abused Kleven into signing over his remaining rights to the character Rin Tin Tin, and in so doing, ascended to those rights in bad faith.

66. Defendants knowingly and intentionally disrupted Plaintiff's ongoing relationship with Kleven and other third parties resulting in substantial monetary harm to Plaintiff and such disruption was the direct and proximate cause of the monetary harm suffered by Plaintiff.

67. By interfering as alleged herein, Defendants Jenson and Miller intentionally acted with oppression, fraud, malice, in a despicable manner and in conscious disregard for the rights of Plaintiff entitling Plaintiff to an award of exemplary and punitive damages against these Defendants, the exact amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief from Defendants' actions in the following form:

1. A declaration that Plaintiff owns fifty (50) percent of the Rin Tin Tin character and is entitled to a pro rata share of any monies received by Defendants as a result of Defendants' exploitation of the Rin Tin Tin character;

2. An order requiring Defendants to provide an accounting to Plaintiff

demonstrating any monies they have made in connection with the Rin Tin Tin character and, if any monies have been made through the exploitation of the character, that Defendants make an appropriate payment to Plaintiff in accordance with his fifty (50) percent ownership;

3. An injunction restraining Defendants from making false statements about Plaintiff's ownership interest or refusing to honor Plaintiff's associated rights in the future;

4. An award of compensatory and punitive damages to compensate Plaintiff for Defendants' actions;

5. An award of punitive damages;

6. Plaintiff's costs and reasonable attorneys' fees associated with this action;

7. Prejudgment interest at the maximum legal rate; and

8. Such other relief as the Court deems just.

DATED: November 5, 2020

GARNER & ASSOCIATES LLP

By: _____
JOHN R. GARNER

**TADLER LAW LLP**
Brian R. Morrison *(pro hac vice forthcoming)*
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone: (212) 946-9300
Fax: (929) 207-3746
bmorrison@tadlerlaw.com

**DUFF LAW, PLLC**
Anderson J. Duff *(pro hac vice forthcoming)*
43-10 Crescent St. Ste. 1217
New York, NY 11101
Telephone: (646) 450-3607
Fax: (917) 920-4217
ajd@hoganduff.com

Attorneys for Plaintiff
SCOTT DUTHIE

# EXHIBIT A

# PURCHASE AND ASSIGNMENT AGREEMENT

**This Purchase and Assignment Agreement** (the "*Agreement*") is signed and made effective on this 3RD day of August, 2011, by and between Max Kleven, an individual, and on behalf of (a) any and all fictitious or other names under which he has operated or done business and (b) any and all business entities of any type whatsoever that he presently controls, is the beneficiary of or owns in full or in part (collectively, the "*Assignor*"), and Scott Duthie, an individual, and Angry Monkey Entertainment, LLC (collectively, the "*Assignee*").

## RECITALS

1. Assignor is the owner of all rights, including but not limited to copyright, in the United States and worldwide to each and every episode of the television series Rin Tin Tin, including, by way of illustration but not limitation, all of the particular episodes of the series, (the "*Property*").

2. Assignor desires to assign to Assignee and Assignee desires to acquire from Assignor **fifty percent (50%)** of all such rights, as well as the chain of title, to and for the Property in order to (a) produce a feature length motion picture and to (b) cause to be generated an income from any and all ancillary properties including, but not limited to a television series and animation series.

3. Assignor has exclusive right and full authority to sell his ownership interests and rights in the Property as well as the ownership interests and rights held by (a) any and all fictitious or other names under which Max Kleven, located at 33150 Barber Road, Agua Dulce, CA 91390, has operated or done business and (b) any and all business entities of any type whatsoever that he presently controls, is the beneficiary of or owns in full or in part.

**NOW, THEREFORE,** in consideration of the foregoing, of the covenants, promises and undertakings set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

## ARTICLE 1.

## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1 "Rights" shall refer to the following rights on an exclusive basis throughout the world in perpetuity: the entire copyright and all rights, title and interest, of every type and nature now known or hereafter devised, in and to the Property, including but not limited to the following:

1.1.1 the entire copyright and all right, title and interest, of every type and nature now known or hereafter devised, in and to the Property;

1.1.2 all copyrights, all motion picture rights of every kind, including, without limitation, theatrical motion picture rights, television motion picture rights, and home video rights, and all allied, subsidiary and derivative rights, including, without limitation, sequel and remake rights, novelization and publication

*Page 1 of 7*          *Assignor's Initials* /M/          *Assignee's Initials* SD

rights, music publishing rights, soundtrack album rights, merchandising rights (including, without limitation the exploitation and/or licensing of characters and other elements of the Property for all types of goods, services and theme parks and other types of attractions), stage rights, radio rights, and promotional and advertising rights (including, without limitation, the right to broadcast, over radio, television and all other media, advertisements with respect to motion pictures or other productions produced hereunder);

1.1.3   the right(s) to change, alter and modify the Property, and distribute, transmit, exhibit, broadcast, and otherwise exploit all motion pictures or other productions produced pursuant to this Agreement (including, but not limited to, ancillary or derivative works) by means of any and all media and devices whether now known or hereafter devised, including, without limitation, in theatres, on television, video cassettes and discs, computer and/or electronic assisted media, including, without limitation, CD-ROM, DVD-ROM and other similar disc systems or digital media, interactive cable, interactive media, on-line services, character, theme park and in any and all markets, methods or media whatsoever now known or hereafter devised;

1.1.4   the right to make, in Assignee's exclusive discretion any and all changes in, additions to, and deletions from the Property;

1.1.5   any and all new, changed, altered or modified rights to the Property that may come into being and/or be recognized in the future, under the law and/or in equity (the "New Exploitation Rights"), and Assignor intends to and does hereby grant and convey to Assignee any and all such New Exploitation Rights to the Property granted by Assignor hereunder. Assignor and Assignee are also aware and do hereby acknowledge that new (or changed) (a) technology, (b) uses, (c) media, (d) formats, (e) modes of transmission, and (f) methods of distribution, dissemination, exhibition or performance (the "New Exploitation Methods") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Property;

1.1.6   the right to require Assignor to execute any document consistent herewith which Assignee reasonably deems in its interest to confirm the existence of the preceding and to effectuate its purpose to convey such rights to Assignee, including without limitation the New Exploitation Rights and any and all New Exploitation Methods;

1.1.7   the right to obtain the full benefit of applicable protection under copyright, trademark and any other applicable law throughout the world with respect to any exercise of Assignee's rights hereunder in the name of Assignee and/or Assignee's designees; and

1.1.8   the right to manufacture, sell, license, advertise, promote, furnish, supply and distribute products, by-products, services, facilities, merchandise and commodities of every nature and description, including, without limitation, video games, artwork, toys, games, items of wearing apparel, food, beverages and similar items which make reference to or are based upon or adapted from the Property or any part thereof or any motion picture or television program based on the Property or any part thereof (including the title thereof) (the "Merchandising Rights").

///

## ARTICLE 2.

### OBLIGATIONS OF, AND REPRESENTATIONS AND WARRANTIES BY, ASSIGNOR

2.1     Assignment of Rights. Upon execution of this Agreement subject to the terms and conditions as defined hereunder, and for the consideration herein set forth, Assignor hereby sells, grants, conveys and assigns fifty percent (50%) of the Rights and the fifty percent (50%) ownership of the complete chain of title to the Property.

2.2     All Rights Conveyed. Assignor agrees that to the fullest extent permitted by law, this Agreement constitutes the assignment and conveyance of all of Assignor's right, title and interest in and to the Property throughout the world in perpetuity.

2.3     No Duty to Exploit. Nothing contained in this Agreement shall be construed as requiring Assignee to exercise or exploit any of the rights granted to or acquired by Assignee under this Agreement.

2.4     Chain of Title. Assignor will provide to Assignee as quickly as is practicable a clean and complete chain of title to the Property and each element or episode thereof, including: (i) a written summary of the Property's development history; (ii) all documentation, including, but not limited to: transfers of rights agreements, writers agreements, option/purchase agreements, publisher's releases, and all other agreements demonstrating that Assignor holds the exclusive worldwide rights to the Property without limitation,

2.5     Other Material. Assignor further agrees to provide all other documents or materials, in any and all forms and/or media, in Assignor's possession or control, or within the possession or control of any of Assignor's employees, agents, attorneys or any other persons under the control of Assignor, which comprise, concern or relate to the Property in any way or manner.

2.6     Representations and Warranties. Assignor represents, warrants and agrees that:

2.6.1    Neither the Property, nor any part or element thereof: (i) infringes upon or violates the copyright or trademark rights of any person or entity; or (ii) to the best knowledge of Assignor after due inquiry, contains any element or material which in any manner constitutes a libel, slander or other defamation of any person or entity or infringes on the personal or property rights or any other rights of any person or entity (including, without limitation, privacy or publicity);

2.6.2    The Property, the Rights and all other rights and privileges granted or to be granted to Assignee hereunder are free and clear of any liens, claims, charges or encumbrances;

2.6.3    No claims, litigation or other proceedings have heretofore been asserted and/or brought and no claims, litigation or proceedings are pending or threatened relating to the Property, the Rights and/or to any of the other rights and privileges granted or to be granted to Assignee hereunder;

2.6.4    Assignor is the sole and exclusive owner of the Property, and all of the Rights, and of all other rights and privileges granted or to be granted to Assignee hereunder and Assignor has full right, power and authority to make and perform this Agreement without obtaining the consent or approval of any person or entity;

2.6.5    No part of the Property is in the public domain (except for minor and incidental material therein);

2.6.6    Assignor has not heretofore in any way exercised or disposed of the Rights or any part thereof. Without limiting the generality of the foregoing, the Property has not previously been performed, exploited or exhibited as a motion picture, television production, audio-visual production, play or other form, except as originally previously exploited and therefore already an element of the Property itself, and no rights have been granted or licensed to any third party to do so.;

2.6.7    The Property may be validly copyrighted and registered for copyright in the United States of America and may similarly be protected elsewhere to the maximum extent that the laws of other countries provide for such protection;

2.6.8    Assignor has not done or omitted to do, nor will Assignor do or omit to do, any act or thing which would impair, encumber or diminish Assignee's full enjoyment of the Rights and all other rights and privileges granted and to be granted to Assignee under this Agreement.

///

## ARTICLE 3.

### OBLIGATIONS OF,
### AND REPRESENTATIONS AND WARRANTIES BY,
### ASSIGNEE

3.1  Payment. Assignee has previously paid to Assignor the sum of one dollar ($1.00) as consideration for this Agreement, the receipt of which is hereby acknowledged by Assignor.

3.2  No Other Obligations. Assignor acknowledges that Assignee has no obligations under this Agreement.

## ARTICLE 4.

### MISCELLANEOUS PROVISIONS

4.1  Signatory Authority. Each individual and entity executing this Agreement hereby represents and warrants that he has the capacity set forth on the signature pages hereof with full power and authority to bind the party on whose behalf he is executing this Agreement without duress to the terms hereof.

4.2  Entire Agreement. This Agreement, together with the Exhibits attached hereto, all of which are incorporated by reference, represents the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties. This Agreement is the result of negotiations between the parties and, accordingly, shall not be construed for or against either party regardless of which party drafted this Agreement, or any portion thereof. The making, execution and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties or agreements other than those expressly set forth herein.

4.3  Severability. If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

4.4  Interpretation. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law. The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto for any reason. Section headings of this Agreement are solely for convenience of reference and shall not govern the interpretation of any of the provisions of this Agreement.

4.5  Applicable Law; Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to the conflicts-of-laws rules and principles of such state. This Agreement shall be deemed executed and performed within the County of Los Angeles and venue shall be deemed proper in the state and/or federal courts located therein.

4.6   **Assignability.** Assignee may assign this Agreement in any manner Assignee shall choose in their exclusive discretion. No assignment shall release Assignee herein named from any obligation or liability under this Agreement. Any assignee shall be deemed to have made any and all representations and warranties made by Assignee hereunder, as if the assignee were the original signatory hereto.

4.7   **Successors Bound.** This Agreement shall be binding upon and inure to the benefit of each of the parties, hereto and to, their respective transferees, successors, and assigns subject to the limitations specified in this Agreement.

4.8   **Captions.** The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.

4.9   **Attorney's Fees.** If either Assignee or Assignor brings any suit or other proceeding relating to or arising out of this Agreement, the transactions described herein or the enforcement hereof, or with respect to a breach of a representation or warranty hereunder, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced) shall, in addition to such other relief as may be awarded, be entitled to recover attorneys' fees, expenses and costs.

4.10   **Cooperation Between Assignor and Assignee.** Assignor and Assignee agree to fully cooperate with each other and utilize their best efforts in regard to the satisfaction of the conditions precedent to Assignee's obligation to purchase the Property by Assignor.

4.11   **Notice.** Any notice required or permitted to be given hereunder shall be deemed to be given when hand delivered, received within normal business hours by facsimile transmission at such numbers as shall be provided by and between the parties, or one (1) business day after pickup by overnight express mail services such as Federal Express, in either case addressed to the parties at their respective addresses referenced below:

If to Assignee:

> Scott Duthie
> 33150 Barber Road
> Agua Dulce, CA 91390
>
> *and*
>
> Angry Monkey Entertainment
> 9005 Overlook Boulevard
> Brentwood, TN 37027

If to Assignor:

> Max Kleven
> 33150 Barber Road
> Agua Dulce, CA 91390

*Page 6 of 7*          *Assignor's Initials* _MK_   *Assignee's Initials* _SD_

4.12  **No Partnership.** Notwithstanding anything to the contrary contained or implied herein, this Agreement shall not be deemed or construed to make the parties hereto partners or joint venturers, or to render either party liable for any of the debts or obligations of the other, it being the intention of the parties to merely create the relationship of Assignor and Assignee with respect to the Property to be conveyed as contemplated hereby.

4.13  **Time of Essence.** Time is of the essence in this Agreement.

4.14  **Counterparts.** This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

4.15  **Effect of Waiver.** No waiver of any provision of this Agreement shall be considered a waiver of any subsequent breach of the same or breach of any other provision of this Agreement.

4.16  **Representation by Counsel.** This Agreement shall be deemed drafted as a result of the mutual negotiations of the parties and each party agrees that this Agreement was negotiated in good faith by and between the parties. No party shall claim any benefit or injury resulting from having any particular party's attorney(s) involved in the preparation of this Agreement. Each party acknowledges that he/it has been advised to seek legal counsel prior to signing this Agreement, has been given the opportunity to do so and that by signing this Agreement each party acknowledges that either he/it did seek independent legal counselor consciously and purposefully did not do so.

4.17  **Joint and Several Liability.** If either party to this Agreement consists of more than one person, each such person shall be jointly and severally liable under this Agreement.

4.18  **Amendment.** This Agreement may be amended only by a written instrument executed by the party or parties to be bound.

4.19  **No Third party Beneficiary.** This Agreement is for the sole benefit of Assignee and Assignor and is not for the benefit of any third party.

## SIGNATURES

**IN WITNESS WHEREOF**, Assignee and Assignor have executed this Agreement on the date set forth in the first paragraph above.

ASSIGNOR:                                  ASSIGNEE:

By: _/s/ Max Kleven_                       By: _/s/ Scott Duthie_
    Max Kleven                                 Scott Duthie